UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KAMAL AL-BITAR, | ) | |
| | ) | |
| Petitioner, | ) | 16 C 6743 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| JEFFERY DENNISON, Warden, Shawnee Correctional Center, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Kamal Al-Bitar, an Illinois prisoner, petitions for a writ of habeas corpus under 28 U.S.C. § 2254. Doc. 19. The petition is denied, and a certificate of appealability will not issue.

**Background**

A federal habeas court presumes that state court factual findings are correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Jean-Paul v. Douma*, 809 F.3d 354, 360 (7th Cir. 2015) ("A state court's factual finding is unreasonable only if it ignores the clear and convincing weight of the evidence.") (internal quotation marks omitted). The Appellate Court of Illinois is the last state court to have adjudicated Al-Bitar's case on the merits. *People v. Al-Bitar*, 2015 IL App (1st) 142347-U (Ill. App. June 30, 2015) (unpublished order) (reproduced at Doc. 21-1). The following sets forth the facts as that court described them, as well as the procedural background of the state criminal and post-conviction proceedings.

A. **Factual Background**

This case involves the non-fatal shooting of Mores Barcham ("Mores") at the King Tut Restaurant in Chicago during the early morning hours of January 25, 2009.

1

Rimon Barcham ("Rimon"), Mores's brother and the restaurant's owner, testified as follows. Rimon and Ehab Farag (the restaurant's manager) asked Mahmoud Saleh (Al-Bitar's brother) and a man named Assad to leave the restaurant because they were arguing with other patrons. Assad and Saleh came back two hours later with Al-Bitar and a man named John. Rimon urged them to leave, but Saleh punched him in the face and fighting broke out. Assad left the restaurant at some point, followed by Al-Bitar. Rimon, Mores, and a man named Mikel Meshko were fighting with Saleh when John came to help Saleh. Rimon saw Al-Bitar re-enter the restaurant. Rimon then heard a gunshot from the front door but did not see the shooter. When the shot was fired, John was carrying Saleh and the pair were almost out the restaurant door. Rimon did not see Assad in the restaurant.

Ehab Nour, who was playing keyboards at the restaurant, testified as follows. When the fighting started, Nour left and stood in the vestibule. Nour saw Al-Bitar, who was wearing a red and white scarf, leave the restaurant and return about a minute later with something pointy in his pocket that Nour believed was a gun. Nour tried unsuccessfully to block Al-Bitar from re-entering. Through a window in the door, Nour saw Al-Bitar, who was standing approximately ten feet inside, shoot Mores. Nour was certain that the shooter was wearing a scarf. Saleh, John, and Assad, who at the time were fighting inside the restaurant, left after the shooting. Although Nour did not talk to the police that evening, he went to a police station a few days later and picked Al-Bitar out of a lineup as the shooter. Nour talked to Rimon once or twice before calling the police.

Wissam Zaia, whom Nour testified was a participant in the fighting, testified as follows. After the fighting began, Assad left the restaurant while Rimon, Mores, and Meshko were kicking Saleh in the face. Zaia saw someone with a big scarf around his face open the interior

2

double doors to the restaurant, shoot Mores, and leave. According to Zaia, the shooter was not Al-Bitar, though he did not know where Al-Bitar was at the time of the shooting. Zaia further testified that Rimon pressured him to tell the police that Al-Bitar, not Saleh, was the shooter. Zaia did not recall telling the police that Al-Bitar shot Mores or identifying Al-Bitar in a lineup.

Hind Limane, who was dating Rimon at the time of the shooting, testified as follows. After the fighting started, Limane's friend Tahrir pulled Al-Bitar off Mores, and Al-Bitar ran outside. Al-Bitar returned with a gun a few minutes later, held it straight up in the air, pointed it towards Mores, and shot him. When Al-Bitar entered the restaurant, someone was helping Saleh leave the building, and Saleh was not inside when the shooting occurred. Limane admitted that she did not tell the police on the day of the shooting that Al-Bitar shot Mores; instead, she lied, telling the police that she heard a shot while she was in the washroom with her mother. Limane explained that she was scared and in shock from what had happened and that Rimon told her not to get involved. A prosecutor later overheard Limane telling a friend what had happened and asked her if she had lied to the police. Limane testified that she then told the prosecutor the truth about what really happened.

Farag testified as follows. Al-Bitar fought with Mores at the outset of the altercation. Farag kicked Assad out of the restaurant, and then Farag, Rimon, Mores, and Meshko removed Al-Bitar, Saleh, and John, who was helping Saleh to leave. Farag, Rimon, Mores, and Meshko were reentering the restaurant, with their backs to the door, when they heard gunfire and saw that Mores had been shot. Farag told police on the night of the shooting that Al-Bitar was the shooter, and he later told two detectives that he saw Al-Bitar open the door to the restaurant with his left hand and raise his right hand and fire one shot from a black semiautomatic. At trial,

3

however, Farag testified that he did not see who fired the gun, explaining that he told police that Al-Bitar was the shooter because that was what everyone at the restaurant was saying.

Meshko testified as follows. When the fighting began, Meshko hit Saleh, Saleh fell down, and Rimon and Mores came to help Meshko. After someone said something to the effect of "that's enough," Rimon, Farag, and John started to help Saleh out the door. Then, the doors opened and Al-Bitar fired a shot. Meshko was five to ten feet from Al-Bitar and nothing was covering Al-Bitar's face. Al-Bitar ran out of the restaurant after the shooting. Meshko tried to follow him, but someone was blocking the door from the outside. Neither Meshko nor Mores had a weapon that evening. Although a police officer testified that Meshko told him that he (Meshko) did not see who fired the shot, Meshko denied that he told the officer this. Meshko picked Al-Bitar out of a lineup as the shooter.

Mores testified as follows. Mores was fighting Al-Bitar when Mores slipped and fell. Al-Bitar jumped on him. Tahrir helped to pull Al-Bitar off of Mores. When Mores got to his feet, he saw that Al-Bitar had a knife. Mores was able to get the knife from Al-Bitar and throw it under a table. Al-Bitar then left the restaurant, and Mores joined the fight against Saleh. Mores did not see Assad. John, Farag, Rimon, and Meshko were in a group walking with Saleh to the door when Mores heard the gunshot. Mores did not see who shot him.

Saleh (as noted, Al-Bitar's brother) testified as follows. When Saleh returned to the restaurant with John, Assad, and Al-Bitar, there were some forty people there. A punch was thrown and a brawl erupted. At some point, Saleh was kicked, fell to his knees, and grabbed the person in front of him. As he was doing so, his right hand felt a weapon on that person's left waist. Saleh grabbed the gun and it discharged as he and the other man fell backwards. Saleh did not know in which direction the gun was pointed when it fired. He then was kicked in the

4

head and the gun flew from his hand. John picked him up and they headed toward the door with Assad and Al-Bitar behind them. Saleh identified a scarf recovered from the restaurant, which contained his DNA, as the scarf he was wearing at the time of the shooting.

A detective testified that, on the night of the shooting, Saleh claimed that he grabbed a gun from the waistband of one of the men he was fighting and that the gun went off as he grabbed it. Saleh did not tell the detective that he was falling backwards when the shot was fired, but he did say that the gun was pointed up at an angle. Saleh testified that he told the police what happened, but he denied saying that the gun discharged in the direction of the ceiling.

The trial court admitted an audio recording of Assad stating that he had told someone to shoot somebody that evening. The prosecution suggested that this statement was "about saying [Assad] told [Saleh] to shoot someone."

### B. Trial Court and Appellate Proceedings

Al-Bitar was charged with several crimes related to the shooting. Following a bench trial, the court found him guilty of aggravated battery with a firearm and aggravated unlawful use of a weapon. Doc. 21-10 at 167-172. The court found credible the testimony of Nour, Limane, and Meshko that Al-Bitar was the shooter, even though Limane and Meshko had denied on the night of the shooting that they saw who fired the shot. *Id*. at 169. By contrast, the court found not credible Saleh's testimony that he pulled the gun out of somebody's waistband as he was being beaten up and then accidentally discharged it while falling backwards. *Id*. at 170-71. As the court explained:

> I studied that testimony closely in relationship to the physical evidence, in particular the photographs of the bullet hole and the location of the bullet, the expelled shell casing which was recovered. Casing was recovered in the

5

> foyer by the front door and particularly People's Exhibit No. 17 is a closeup of the photograph.
>
> It's marked, if you look at it, … there's an abrasion at about two o'clock, which in the Court's opinion, means that the bullet came from right to left at a downward angle. That's corroborated by People's Exhibit No. 19, which … shows the drywall pulled away and the bullet hole would be on the right and then there's damage in the back there again showing trajectory right to left.
>
> The front door is to the right so that refutes [Saleh's] testimony that the shot came from him as he was falling back because he was further into the restaurant actually to the left of where the bullet hole went into the wall.
>
> So the physical evidence contradicts what [Saleh] said.

*Ibid*. The court sentenced Al-Bitar to concurrent prison terms of eight years and three years on the two counts of conviction. Doc. 21-7 at 214-17.

In a motion for a new trial, Al-Bitar submitted affidavits from Zaia, John Dahbour, and George Metry averring that Rimon pressured witnesses to falsely identify Al-Bitar as the shooter. Doc. 21-7 at 109-27. The trial court denied the motion. Doc. 21-11 at 17-20. The court reaffirmed its view, expressed when delivering its verdict, that Nour and Meshko were credible and that the physical evidence corroborated their testimony. *Id*. at 17. And the court reiterated its view that the bullet hole shows that the bullet "came from right to left in a downward angle," which "made it impossible for … Saleh … to have been the shooter." *Id*. at 18.

On appeal, Al-Bitar argued that the evidence was insufficient to prove him guilty beyond a reasonable doubt. Doc. 21-2. The Appellate Court of Illinois affirmed. *People v. Al-Bitar*, *supra*. The Supreme Court of Illinois denied Al-Bitar's petition for leave to appeal, which raised the sufficiency of the evidence challenge. Docs. 21-5, 21-6. Al-Bitar did not seek state post-conviction relief.

**Discussion**

Al-Bitar's federal habeas petition asserts these four claims: (1) the evidence at trial was insufficient to convict him; (2) his Sixth Amendment rights were violated because his attorney advised Saleh to remain silent when he was being questioned at the police station following the shooting; (3) he was denied a fair trial because the trial court improperly denied his motion to suppress Mores's identification of him as the shooter; and (4) the prosecution improperly withheld from the defense a statement by Zaia that Zaia had been offered money by Rimon to testify against Al-Bitar. Doc. 19. The second, third, and fourth claims are procedurally defaulted, and the first claim fails on the merits.

**I.     Procedurally Defaulted Claims**

Al-Bitar does not dispute that he procedurally defaulted his second, third and fourth habeas claims. Doc. 24 at 2. Al-Bitar may overcome the procedural default either by demonstrating cause and prejudice, or by showing that this court's failure to consider those claims would result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010). Al-Bitar attempts to invoke the fundamental miscarriage of justice gateway to considering his procedurally defaulted claims. Doc 24 at 2-4.

"The fundamental miscarriage of justice standard erects an extremely high bar for the habeas petitioner to clear. It applies only in the rare case where the petitioner can prove that he is actually innocent of the crime of which he has been convicted." *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013); *see also Blackmon v. Williams*, 823 F.3d 1088, 1101 (7th Cir. 2016) (holding that the standard "is demanding and permits federal court review only in the extraordinary case") (internal quotation marks and brackets omitted). "To pass through th[is]

actual-innocence gateway to a merits review of … procedurally barred claim[s], [a] petitioner must have 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). "'New evidence' in this context does not mean 'newly *discovered* evidence'; it just means evidence that was not presented at trial." *Ibid*. "The petitioner must prove, based on this evidence, that it was more likely than not that no jury would have convicted him at trial were the new, exculpatory evidence available." *McDowell*, 737 F.3d at 483. "[B]ecause an actual-innocence claim [necessarily] involves evidence the trial jury did not have before it," the habeas court must evaluate "how reasonable jurors would react to the overall, newly supplemented record." *Jones*, 842 F.3d at 461 (internal quotation marks omitted).

Al-Bitar's "new evidence" consists of three affidavits. Doc. 19-1 at 1-15. (A fourth affidavit, submitted by Saleh, speaks to the merits of Al-Bitar's Sixth Amendment claim rather than "actual innocence," *id*. at 16-17, and so is not pertinent to this discussion.). The first, by Zaia, avers that shortly after the shooting, Rimon told everyone present that they should not "tell the police that [Saleh] shot the gun, say it was [Al-Bitar]." Doc. 19-1 at 2. According to Zaia, Rimon then embarked on a campaign to "pressure everyone to state false information to the police," threatening to withhold his employees' backpay and offering "money to [Zaia, Farag, Nour, and Limane]" to induce them to testify that Al-Bitar was the shooter. *Id*. at 2-3. According to Zaia, Nour—who at trial identified Al-Bitar as the shooter—has since told Zaia that he did not see Al-Bitar shoot Mores. *Id*. at 3-4.

The second affidavit, by Dahbour, avers that he "saw and heard a loud gunshot, with a flaming flash coming directly from [Saleh's] right hand as [Saleh] was falling backwards" during

the fight at the restaurant. *Id*. at 10. Dahbour further avers that he did not previously identify Saleh as the shooter because he was "afraid for his life and the lives of his family." *Id.* at 11.

The third affidavit, by Metry, states that he arrived at the restaurant shortly after the shooting. *Id*. at 13. Metry avers that when he asked Rimon, Meshko, Zaia, Limane, Farag, and Nour "what happened … they uniformly said they had no clue" and did "not know who fired the shot." *Ibid*. Metry further avers that, in August 2013, Nour admitted to Metry that he had testified falsely at trial because Rimon offered him $100,000 to say that Al-Bitar was the shooter. *Id*. at 14. According to Metry, Rimon told Nour that the gun used in the shooting belonged to Meshko and was "used for security purposes" at a liquor store that Mores owned. *Ibid*. Rimon believed it was important to frame Al-Bitar as the shooter because it would not "have been favorable for [Rimon and Mores] with the police," with "the Licensing Departments" for Rimon's restaurant and Mores's liquor store, or for "[Mores'] insurance claim" against the restaurant if it became known that Saleh had shot Mores with Meshko's gun. *Ibid*.

Before proceeding to review the "overall, newly supplemented record," *Jones*, 842 F.3d at 461, it bears mention that little of Al-Bitar's new evidence qualifies as the kind of "reliable evidence"—"exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," *Schlup*, 513 U.S. at 324, or "documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs," *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005)—that the Seventh Circuit and the Supreme Court have held is generally necessary to pass through the actual innocence gateway. Neither Zaia nor Metry aver that they saw the shooting or provide an alibi for Al-Bitar; instead, they merely call into question the credibility of the witnesses (Zaia, Farag, Nour, Limane, and Meshko) who at some point identified Al-Bitar as the shooter. That

9

evidence falls far short of the kind of evidence ordinarily required by the actual innocence gateway. *See McDowell*, 737 F.3d at 484 (holding that the petitioner could not pass through the actual innocence gateway where his new evidence, "[r]ather than establishing [his] innocence[,] … tend[ed] to impeach [a detective's] credibility"); *Hayes*, 403 F.3d at 937-38 (same as to the new alibi testimony of six witnesses that would have placed the petitioner at home rather than at the scene of the shooting); *cf. Arnold v. Dittman*, 901 F.3d 830, 836-42 (7th Cir. 2018) (holding that an eyewitness's *own* recantation could, under some circumstances, support invocation of the actual innocence gateway).

With that preliminary observation, the court proceeds to review the record that would have been available to a trier of fact if the evidence in Zaia's, Dabhour's, and Metry's affidavits had been available at trial. The witnesses alternatively identified Saleh and Al-Bitar as the shooter. Three eyewitnesses—Nour, Limane, and Meshko—testified at trial that the shooter was Al-Bitar. According to Metry's and Zaia's affidavits, Nour has since admitted to them that his testimony was false. As for the other two eyewitnesses, Meshko did not immediately tell the police that Al-Bitar was the shooter, and Limane initially told the police that she did not see the shooting—and Metry avers that both told him on the night of the shooting that they did not know who shot Mores, and Zaia avers to his belief that Rimon pressured Limane to testify that Al-Bitar was the shooter. On the other side of the ledger, circumstantial evidence supporting Nour, Limane and Meshko's trial testimony included Farag's prior statement to police that Al-Bitar was the shooter, although Farag testified at trial that he did not know who shot Mores.

By contrast to Nour's, Limane's, and Meshko's trial testimony, Saleh (as noted, Al-Bitar's brother) testified at trial that he was the shooter and Dabhour avers in his affidavit that he saw Saleh fire a shot as he was falling backwards. A detective who spoke with Saleh on the

10

night of the shooting testified at trial that Saleh said that the gun was pointed "up at an angle when it discharged"; however, Saleh testified that he "did not know what direction the gun was pointing" when it went off. There is some circumstantial evidence supporting the notion that Saleh was the shooter: (1) a recording of Assad allegedly telling somebody that he told Saleh to shoot someone on the night of the shooting; (2) Zaia's and Metry's affidavits, which suggest that Rimon framed Al-Bitar and believed that the shooter was actually Saleh; and (3) Zaia's and Nour's testimony that the shooter was wearing a scarf, together with evidence that only Saleh's DNA was found on the scarf recovered at the restaurant.

Based on this record, the court cannot conclude that it is more likely than not that no reasonable trier of fact would have convicted Al-Bitar. *See Hayes*, 403 F.3d at 938. To be sure, some evidence presented at trial, supplemented by the evidence in Al-Bitar's habeas petition, suggests that Saleh, not Al-Bitar, was the shooter. Yet none of that evidence comes close to refuting the proposition—expressed by the trial court on two separate occasions, the second with the benefit of the same affidavits supporting the present habeas petition—that the key physical evidence (the angle of the bullet hole) refutes Al-Bitar's theory that the shot came from Saleh as he was falling backwards. With or without that physical evidence, none of Al-Bitar's evidence, new or old, would disentitle a reasonable trier of fact from believing Nour's, Limane's, and Meshko's consistent eyewitness testimony that Al-Bitar was the shooter. None of Al-Bitar's evidence, new or old, would disentitle a reasonable trier of fact from disbelieving the principal testimonial source of Al-Bitar's theory—Saleh—on the ground that Saleh was trying to protect Al-Bitar, his brother. None of Al-Bitar's evidence, new or old, would disentitle a reasonable trier of fact from further discounting Al-Bitar's theory due to the inconsistency between Saleh's testimony that he accidentally fired the gun and Assad's recorded statement indicating that the

11

shooting was intentional. And none of Al-Bitar's evidence, new or old, would preclude a reasonable trier of fact from concluding that even though the shooter was described as wearing a scarf, and even though the one scarf found at the scene of the shooting had only Saleh's DNA, others at King Tut Restaurant that evening, including (as Nour testified) Al-Bitar, were wearing scarfs as well.

Given all this, Al-Bitar's newly discovered evidence, even viewing the record as a whole, does not allow him to pass through the actual innocence gateway. *See Blackmon*, 823 F.3d at 1101-02 (holding that testimony from two new witnesses that the petitioner was not the shooter "d[id] not meet the demanding *Schlup* standard for actual innocence," even though "no physical evidence tied him to the murder, and the State introduced no evidence of a motive," where two other eyewitnesses had testified that he was the shooter); *Gladney v. Pollard*, 799 F.3d 889, 899 (7th Cir. 2015) (holding that new evidence permitting a "possible inference but by no means a required [inference]" of the petitioner's innocence was insufficient to meet his "heavy burden" of showing that "it is likely that *no* reasonable juror would have convicted"). Because Al-Bitar "has not shown the miscarriage of justice needed to excuse his procedural default, [the court] do[es] not consider the merits of [his procedurally-defaulted] claim[s]." *Blackmon*, 823 F.3d at 1102.

## II.     Actual Innocence

On direct appeal, Al-Bitar argued that the evidence at trial was insufficient for the court to find him guilty beyond a reasonable doubt. Doc. 21-2 at 2, 4, 7-16. The state appellate court rejected that argument, applying the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). 2015 IL App 142347-U at ¶¶ 17-28.

12

In his counseled habeas petition, Al-Bitar does not renew his *Jackson* argument; instead, he argues that he is "factually innocent" of the charges in light of the trial testimony *and* the affidavits presented with his habeas petition. Doc. 19 at 3-13. In his answer, the Warden addresses this claim as a freestanding actual innocence claim. Doc. 20 at 9-10. In his reply, Al-Bitar does not dispute that characterization; in fact, his discussion of innocence is set forth as part of his argument that his procedural default should be excused under the fundamental miscarriage of justice exception. Doc. 24 at 1-4.

Freestanding actual innocence claims have not been recognized as cognizable on federal habeas review. *See Tabb v. Christianson*, 855 F.3d 757, 764 (7th Cir. 2017). Even if such claims were cognizable, "it is clear that evidence of innocence will need to meet an 'extraordinarily high' threshold." *Ibid.* (citing *Herrera v. Collins*, 506 U.S. 390, 417 (1993)). For the reasons set forth in rejecting Al-Bitar's attempt to invoke the actual innocence gateway, he has not meet that "extraordinarily high" threshold, so his freestanding actual innocence claim would fail even if it were cognizable.

**Conclusion**

Al-Bitar's habeas petition is denied. Habeas Rule 11(a) provides that the district court "must issue or deny a certificate of appealability [('COA')] when it enters a final order adverse to the applicant." *See also Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011). Regarding Al-Bitar's claims, the applicable standard is:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration … includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.

*Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (internal quotation marks omitted); *see also Peterson v. Douma*, 751 F.3d 524, 528 (7th Cir. 2014) (same).

The court's denial of Al-Bitar's habeas claims relies on settled precedents and principles. The application of those precedents and principles to Al-Bitar's claims does not present difficult or close questions, and so this case does not meet the standard for granting a certificate of appealability. The court therefore denies a certificate of appealability.

June 21, 2019

_____
United States District Judge